UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NATIONAL PRODUCTS, INC.,

Plaintiff,

v.

GAMBER-JOHNSON LLC,

Defendant.

CASE NO. C08-0049JLR

ORDER GRANTING IN PART
AND DENYING IN PART POST-
TRIAL MOTIONS

## I.   INTRODUCTION

Before the court is (1) Defendant Gamber-Johnson LLC's ("Gamber-Johnson")

motion for a directed verdict or judgment as a matter of law (Dkt. # 180)[1]; (2) a motion

_____

[1] The 1991 Amendments to Federal Rule of Civil Procedure 50 abolished the terminology "direction of verdict" in favor of the term "judgment as a matter of law." Fed. R. Civ. P. 50(a) comments to 1991 Amendments. "If a motion is denominated a motion for directed verdict . . ., the party's error is merely formal. Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule." *Id.* Thus, despite Gamber-Johnson's reliance on the pre-1991 terminology, the court considers the motion as a motion for judgment as a matter of law.

ORDER- 1

1   for permanent injunction and other relief by Plaintiff National Products Inc. ("NPI")

2   (Dkt. # 205); and (3) a motion to strike materials not admitted at trial by Gamber-Johnson

3   (Dkt. # 245).  The court, having reviewed the numerous briefs filed in support and

4   opposition to the motions, including the supplemental and surreply briefs filed by the

5   parties, as well as having heard the argument of counsel, GRANTS in part and DENIES

6   in part Gamber-Johnson's motion for judgment as a matter of law (Dkt. # 180); GRANTS

7   in part and DENIES in part NPI's motion for permanent injunction and other relief (Dkt.

8   # 205); and GRANTS Gamber-Johnson's motion to strike materials not admitted at trial

9   (Dkt. # 245).

10          Pursuant to § 35(a) of the Lanham Act, the court GRANTS Gamber-Johnson's

11   motion for judgment as a matter of law and adjusts the jury's award of damages to

12   $492,332.  The court DENIES the remaining arguments raised in Gamber-Johnson's

13   motion.  (Dkt. # 180.)  In ruling on the motion for judgment as a matter of law, the court

14   does not consider materials submitted by NPI that were not admitted at trial and therefore

15   GRANTS Gamber-Johnson's motion to strike.  (Dkt. # 245.)  Finally, the court GRANTS

16   NPI's motion for a permanent injunction, as amended by the court, GRANTS its motion

17   for attorney's fees and costs, and DENIES its motion for prejudgment interest.  (Dkt. #

18   205.)  The court directs the clerk to enter judgment consistent with the jury's verdict and

19   this court's order.

20          ## II.   BACKGROUND

21          Gamber-Johnson and NPI compete in the vehicle laptop mounting business.  As

22   the name suggests, the companies design and sell mounting systems for laptops in

vehicles.  This dispute relates to a video produced by Gamber-Johnson titled "The Mounting Evidence."  The video purports to set forth the opinion of airbag safety expert, David Long, as to the safety benefits of purchasing a Gamber-Johnson mounting system versus other mounting systems in the market, including one developed by NPI called the "RAM."  NPI sued Gamber-Johnson for false advertisement under the Lanham Act based on allegedly false statements made in the video regarding its RAM product.

The matter was tried to a jury in April 2010.  The four-day trial concluded on April 9, 2010.  On April 12, 2010, after deliberating for less than three hours, the jury returned a verdict for NPI finding that Gamber-Johnson had deliberately engaged in false advertising and awarded NPI $10,000,000 in damages.  (*See* April 12, 2010 Verdict (Dkt. # 191).)  The jury found that four of the statements made in the video relating to the NPI product were false or misleading.  The following day, the court ordered that the parties submit supplemental briefing on Gamber-Johnson's motion for judgment as a matter of law addressing the jury's award of damages and additional briefing on NPI's request for injunctive relief.  (Dkt. # 192).

### III.   ANALYSIS:

**A.   Motion for Judgment as a Matter of Law**

Generally, the standard for reviewing a jury verdict is whether it is supported by substantial evidence.  *See Fabrica, Inc. v. El Dorado Corp.*, 697 F.2d 890, 894-95 (9th Cir. 1983).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Section 35(a) grants the district court discretionary power to

1 | modify monetary awards pursuant to the Lanham Act,. *See Playboy Enter., Inc. v.*
2 | *Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982).  This section also directs the
3 | court to ensure that a recovery under the Lanham Act is "subject to the principles of
4 | equity."  15 U.S.C. § 1117(a).  Accordingly, in accessing the equity of the jury's award,
5 | the court adheres to the standard set forth in 15 U.S.C. § 1117(a), as well as the cases
6 | interpreting this standard.

7 |         A.  Damages Pursuant to § 35(a)

8 |         Damages for false advertisement claims under the Lanham Act are governed by 15
9 | U.S.C. § 1117.  Section 35(a) entitles the plaintiff to three types of remedies: (1)
10 | disgorgement of defendant's profits; (2) plaintiff's actual damages (lost sales); and (3) the
11 | cost of the action.  This section also confers a great deal of discretion on a district court in
12 | fashioning a remedy for violations of the Act.  *Maier Brewing Co. v. Fleischmann*
13 | *Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968); *see also Playboy*, 692 F.2d at 1275.
14 | The district court can increase the damages assessed up to three times those found as
15 | actual damages, and it may respond to a perceived inadequacy or excessiveness of profits
16 | by entering as a judgment such a sum as may be found to be just "according to the
17 | circumstances of the case."  15 U.S.C. § 1117(a).  The district court must not only be
18 | guided by principles of equity but must also ensure that its award constitutes
19 | "compensation and not a penalty."  *Id.*

20 |         The court begins its analysis by distinguishing the two types of damages available
21 | under the Lanham Act: actual damages and defendant's profits.  Section 35(a)
22 | differentiates between (1) an award of "actual damages," such as plaintiff's loss sales,

ORDER- 4

1    and (2) an award of defendant's "profits," based on an unjust enrichment theory.  15

2    U.S.C. § 1117(a).  This difference has an important effect on the court's discretion to

3    determine damages.  With respect to an damage award based on profits, the district court

4    may find the damage award inadequate or excessive and may in its discretion "enter

5    judgment for such sum as the court shall find to be just, according to the circumstances of

6    the case."  *Id.*  Conversely, with respect to actual damages, the district court is permitted

7    to increase damages up to three times the amount of damages found by the fact-finder,

8    but is not granted authority to reduce actual damages without a concurrent finding that

9    the award of actual damages was not based on "substantial evidence" as discussed above.

10   *Id.*

11       NPI did not seek actual damages at trial for lost sales nor does it seek any actual

12   damages in its post-trial motions.  (*See* NPI Resp. (Dkt. # 208) at 15; NPI Sec. Resp.

13   (Dkt. # 211) at 1 (NPI stating that it did not assert a lost sales theory at trial); July 1, 2010

14   Tr. at 18 ("Court: Do I understanding your briefing properly that you are not making a

15   claim for actual damages?  Mr. Tellekson [counsel for NPI]: Yes, your honor.  Yes, your

16   honor."); Tr. at 26 (Mr. Tellekson: "And damages can be actual damages, which we're

17   not claiming, and they could be the defendant's profits.")).  The court therefore limits its

18   ruling on damages to those based on an unjust enrichment theory or disgorgement of

19   Gamber-Johnson's profits and does not consider whether there was substantial evidence

20   to support a finding of actual damages of $10,000,000.

21

22

ORDER- 5

B. <u>Considerations in Awarding Damages</u>

In determining the appropriate compensation, the court must be mindful to compensate NPI and not punish Gamber-Johnson.  The Ninth Circuit's guidance in achieving an award that compensates without punishing provides a number of principles for this court to follow.  To begin, the district court must determine damages in a Lanham Act action in light of equitable considerations.  *Maier Brewing*, 390 F.2d at 120.  "The equitable limitation upon the granting of monetary awards . . . would seem to make it clear that such a remedy should not be granted as a matter of right."  *Id.; see also Burger King Corp. v. Mason*, 855 F.2d 779, 780 (11th Cir. 1988).  When fashioning a remedy in a given case, the court must rely "not merely on the legal conclusion of liability, but [must] also . . . consider the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party."  *Lindy Pen Co., v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993) (quoting *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 918 (Fed. Cir. 1984) (applying Ninth Circuit law)); *see also Highway Cruisers of Cal., Inc. v. Sec. Indus., Inc.*, 374 F.2d 875, 876 (9th Cir. 1967) ("One may get just enough relief to stop the evil . . . .").  When awarding damages, the court must also be cognizant of the Ninth Circuit's admonition in *Bandag* that a plaintiff is not entitled to a "windfall" of an award.  750 F.2d at 918.

The Ninth Circuit provided additional guidance in *Southland Sod Farms v. Stover Seed Co.*, wherein it explained that the preferred approach in determining damages is to fashion relief, including monetary relief, based on the "totality of the circumstances,"

while at the same time being careful to not simply penalize the defendant.  108 F.3d 1134, 1146 (9th Cir. 1997) (citing *Badger Meter, Inc. v. Grinnel Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994)).  The court should ensure that the damage award is based on actual evidence of injury from the deceptive advertising.  In *Harper House, Inc. v. Thomas Nelson, Inc.*, for example, the Ninth Circuit held that the district court erred in failing to grant a judgment notwithstanding the verdict on the jury's award of $1,860,307 for a Lanham Act violation.  889 F.2d 197, 210 (9th Cir. 1989).  The Ninth Circuit found that the award was unjustified as there was no "actual evidence" of some "injury *resulting from the deception*."  (*Id.*)

Finally, the court should take into consideration the jury's finding that Gamber-Johnson engaged in the false advertisement deliberately.  *See Bandag*, 750 F.2d at 917 (stating that it is "essential in fashioning the remedy in this case to rely, not merely on the legal conclusion of liability, but also to consider the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party.")

In sum, in fashioning appropriate relief in this case, the court is guided by the following: (1) a remedy should not be granted as a matter of right; (2) the remedy must represent compensation for damages and not a punishment to the defendant; (3) NPI is not entitled to a windfall; (4) there must be some evidence of damage attributable to the false advertisement; (5) the court must look to the "totality" of the circumstances; and (6) the court should consider the jury's finding that Gamber-Johnson engaged in deliberate false advertisement.

C.  <u>Presumption of Injury</u>

The question of NPI's burden to prove damages in this case was explored at length during the summary judgment proceedings.  Gamber-Johnson moved to dismiss NPI's Lanham Act claims on the basis that it has no proof that any sales were diverted from it as a result of the allegedly false statements in the video. (Mot. for Sum. J. (Dkt. # 75) at 22 (asserting that to recover damages NPI must first show "actual diversion of customers").)  NPI responded that it "enjoys an evidentiary presumption of actual deception and reliance" because Gamber-Johnson published a deliberately false advertisement.  (Resp. at 23.)  The court agreed with NPI that it was entitled to a presumption of actual deception and reliance if Gamber-Johnson's statements in The Mounting Evidence were found to be false or misleading.  In making this determination, the court relied on the Ninth Circuit's explanation of this presumption in *U-Haul Int'l, Inc. v. Jartran, Inc*., 793 F.2d 1034, 1040-41 (9th Cir. 1986):

> It is not easy to establish actual consumer deception through direct evidence.  The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived.  He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded.

793 F.2d at 1040-41 (awarding damages based on corrective advertising expenditures); *see also Southland Sod*, 108 F.3d at 1146 (holding that an inability to show deception and actual damages does not alone preclude a recovery for false advertisement).)  The court went on to conclude that in a direct comparative advertising case, plaintiffs, like NPI, who are victims of deliberately false advertising are entitled to a presumption of

1   consumer deception and injury.  The court also found that the presumption extended to a

2   finding of damage to NPI's goodwill and reputation.  The presumption of damages,

3   however, did not extend to the diversion of sales, measured by either NPI's alleged loss

4   profits or Gamber-Johnson's alleged gains.  At trial, the jury was instructed on this

5   presumption as well.  (*See* Jury Instructions (Dkt. # 185) at No. 14 ("NPI is not entitled to

6   a presumption of injury as to profits gained or lost as a result of a false statement.").)

7   Because the jury found that Gamber-Johnson engaged in deliberate false advertisement in

8   a comparative advertisement case, there is a presumption of injury to NPI's goodwill and

9   reputation.  Injury to goodwill and reputation, however, is an element of actual damages

10  that NPI disavowed in its post-trial motions.

11          Throughout the trial, NPI had the burden of proving damages by a preponderance

12  of the evidence.  Because NPI was not claiming actual damages, it had to prove that it

13  was entitled to any profits that Gamber-Johnson earned that are attributable to the false

14  advertising.  (Jury Instructions at No. 19).  Once NPI proves that the profits earned by

15  Gamber are attributable to the false advertising then, and only then, does the burden shift

16  to Gamber-Johnson to prove its expenses and the portion of the profit attributable to

17  factors other than the false advertising.  (*Id.*; *see also* Manual of Model Civil Jury

18  Instructions, Ninth Cir. 15.26 (April 25, 2007).)  This burden-shifting distinction

19  becomes important in the court's evaluation of NPI's "pool of money" theory discussed

20  below.

21

22

ORDER- 9

D. Post-Trial Evidence of Profits

The court's hesitation with respect to an award of damages to NPI based on an unjust enrichment theory is caused by the dearth of evidence proving that *all* of Gamber-Johnson's sales during the relevant time period, and its resulting profits, are "attributable to the false advertising."  At a post-trial hearing, the court presented its reluctance to attribute all profits to the video and requested evidence from NPI evidencing a connection between the video and the profits.  NPI responded with evidence from trial proving that at least two companies chose to purchase the Gamber-Johnson product after reviewing The Mounting Evidence: Comcast and Itronix.

After the hearing, the court requested that the parties each submit a supplemental brief addressing Gamber-Johnson's profits from its sales to "Comcast and General Dynamics Itronix from May 15, 2007 through April 2010."  (July 2, 2010 Order (Dkt. # 234) at 1.)  While there is evidence in the record to support a jury's finding that the sales to Comcast and Itronix were influenced by the video, NPI never offered any evidence at trial quantifying Gamber-Johnson's profits from these sales.  Only in response to the court's request for a calculation of profits based on the Comcast and Itronix sales did NPI offer evidence supporting the value of these sales.  This evidence, however, was not offered at trial and NPI has not moved to reopen the record post-trial.  Consideration of evidence outside the record is improper under Fed. R. Civ. P. 50(b) because such motions challenge the sufficiency of the evidence based on the record "as it existed when the trial was closed." *Elbert v. Howmedica, Inc.*, 143 F.3d 1208, 1209 (9th Cir. 1998) (quoting *Schudel v. General Elec. Co.*, 120 F.3d 991, 995 (9th Cir. 1997) (the "record should be

1   taken as it existed when the trial was closed.  This rule promotes certainty: litigants need

2   not supplement conditionally admitted evidence, perhaps, unnecessarily; and district

3   courts need not speculate as to what other evidence might have been offered if the

4   evidence had been excluded at trial.")).

5          Here, of course, none of the evidence that NPI now seeks to introduce is "newly

6   discovered."  There is no dispute that NPI had these materials and chose not to use them

7   at trial.  The court will not reopen the record simply because the movant "failed to prove

8   his strongest case" and wants "a second opportunity to litigate a point, to present

9   evidence that was available but not previously offered, or to advance new theories."  9C

10  Wright & Miller § 2582, at 353 (3d ed. 2008).  NPI chose not to ask for actual damages at

11  trial and chose not to include an accounting of profits attributable to customers that

12  bought Gamber-Johnson's product after viewing the video.  The court will not permit it

13  to reopen the evidence to include NPI's post-trial evidence of damages.  Accordingly, the

14  court grants Gamber-Johnson's motion to strike Exhibits A-G of the Demarchi

15  Declaration.  Without evidence of profits attributable to Comcast and Itronix, the court is

16  unable to award damages based on the profits made by Gamber-Johnson with respect to

17  sales to these companies.  *See Lindy Pen*, 982 F.2d at 1407.

18          E.  Profits Attributable to False Advertisement

19          The court now turns to the evidence of damages that was presented at trial.  NPI

20  offered an expert witness, Scott Hampton, to opine on the amount of profit made by

21  Gamber-Johnson during the time that The Mounting Evidence was in circulation.  Mr.

22  Hampton began by calculating Gamber-Johnson's profits over the period May 15, 2007,

1   the date the video was released, through December 2008, the date that Gamber-Johnson

2   took down the website for The Mounting Evidence video.  (April 8, 2010 Trial Transcript

3   ("4/8/2010 Tr.") (Dkt. # 230) at 71.)  Mr. Hampton began his profits analysis by

4   reviewing Gamber-Johnson's financial statements for the period of time when the video

5   was most extensively used.  He determined that during the applicable time period,

6   Gamber-Johnson sold $54,194,000 worth of vehicle base mounts.  (4/8/2010 Tr. at 73.)

7   After deducting $31,623,347 for the costs associated with those sales, Mr. Hampton

8   calculated Gamber-Johnson's profits during this time period to be $22,570,826.[2]  (Id.)

9        Mr. Hampton also testified that in forming his opinions he reviewed documents

10  evidencing that Gamber-Johnson took customers from NPI.  (4/8/2010 Tr. at 77.)  The

11  documents he reviewed to support a diversion of sales theory included Trial Exhibit 216

12  (the "Molski email") and Trial Exhibit 274 (the "Zuelke email").  (Id.)  Both emails were

13  offered by NPI to show that the video was effective and that customers were diverted to

14  Gamber-Johnson.  With respect to the Molski email, however, Mr. Hampton testified on

15  cross-examination that he did not know the identity of the diverted customer, what factors

16  influenced his buying decision, which statements in the video influenced his decision, or

17  whether the person ever bought the Gamber-Johnson system.  (Id. at 77-78.)  With

18  respect to the Zuelke email, Mr. Hampton testified that he did not know if Mr. Zuelke

19

20        [2]  Gamber-Johnson's expert calculated a profit margin of 29.8 %, which was lower than

21  the 41.6% profit margin calculated by NPI's expert.  (See 4/8/2010 Tr. at 73; 4/9/2010 Tr. at 92.)
    The court assumes that the jury was persuaded by the profit margin provided by NPI's expert and

22  it uses that number in its analysis.

1    distributed the videos that were sent to him, nor does the email say anything about

2    whether the video was effective in diverting sales from NPI, as opposed to the other

3    competitors mentioned in the video.[3]  (*Id.*)  Accordingly, Mr. Hampton's analysis is

4    based on antidotal evidence that unidentified customers were influenced by the video.

5         Relying on Mr. Hampton's testimony as its spring board for damages, in its post-

6    trial arguments, NPI attempts to rationalize the jury's $10,000,000 award by offering the

7    following explanation.  NPI begins with the assumption that the jury based the monetary

8    award on *all* of Gamber-Johnson's profits from the sale of vehicle mounts from May 15,

9    2007 through December 31, 2008, which totaled approximately $54 million.  (4/8/10 Tr.

10   at 73:16–20, 73:24–74:1; Trial Exs. 295, 371; 4/9/10 Tr. at 91:24–92:5.)  NPI then

11   calculates the Gamber-Johnson's profit using the lower profit margin offered by Gamber-

12   Johnson of 29.8% and finds that Gamber-Johnson's profit during this time was

13   approximately $16 million.  (4/9/10 Tr. at 92:12–25.)  NPI then argues that the jury made

14   a "few additional deductions" and came up with a damage award that was consistent with

15   Mr. Hampton's testimony.

16        Gamber-Johnson offered its own economist at trial, Mr. Carl Degen.  Mr. Degen

17   testified that he "strongly disagreed" with Mr. Hampton's opinion that all of Gamber-

18   Johnson's profit during the relevant time-period was a decent proxy of the amount of

19   Gamber-Johnson's unjust enrichment.  (4/9/2010 Tr. at 72 (explaining that Mr.

20

21        [3] Although, as an expert, Mr. Hampton may rely on inadmissible evidence to support his
     opinions, the court notes that both the Molski email and the Zuelke email were admitted into
22   evidence for a purpose other than to show that customer's were diverted and that sales were
     gained by Gamber-Johnson.

1   Hampton's analysis assumes that once the video was distributed every sale made by

2   Gamber-Johnson from that day forward was attributable to the false statements made in

3   the video).)  Mr. Degen also points out that there were multiple vendors identified in the

4   video.  (*Id.*)  Thus, Mr. Degen testified that Mr. Hampton's opinion not only assumed that

5   all of Gamber-Johnson's sales were attributable to the video but also that none of

6   Gamber-Johnson's customers were diverted from other vendors as a result of the video.

7       Mr. Degen opined that NPI's lost profit from sales during this time period of

8   approximately $350,000 was the best indication of Gamber-Johnson's gained profit from

9   a diverted sales that would have gone to NPI.  (*Id.* at 72.)  This calculation is also

10  consistent with Mr. Hampton's trend analysis of NPI's lost sales during the relevant time

11  period.  (4/9/2010 Tr. at 74 (Mr. Hampton, using a trend analysis, calculated NPI's lost

12  sales during the relevant time period to be approximately $385,000)).)  Mr. Degen,

13  alternatively, performed a trend analysis on Gamber-Johnson's profits to determine if it

14  made a profit during the relevant time period.  Mr. Degen first assumed that there were

15  no other factors that could have increased Gamber-Johnson's profits other than diverted

16  sales from NPI. (4/9/2010 Tr. at 76; 77-80; 85-86.)  He then calculated Gamber-

17  Johnson's revenue over the relevant period and identified an increase in sales of

18  $1,183,492, in relation to Gamber-Johnson's historical revenue trend.  (*Id.*)  Using the

19  lower profit margin he calculated of 29.8%, Mr. Degen determined that based on the

20  historical trend analysis, Gamber-Johnson's additional profits during this time were

21  $352,796.  (*Id.* at 86.)  NPI did not offer additional evidence to refute this calculation.

22  However, the court notes that had Mr. Degen used the higher profit margin posited by

1  Mr. Hampton of 41.6%, Gamber-Johnson's net profit during the relevant time-period,

2  based on a trend analysis, would have been approximately $492,332.

3        The court is not convinced by Mr. Hampton's opinion that all of Gamber-

4  Johnson's sales during the relevant time period would have gone to NPI but for the video,

5  and thus cannot find that an award of $22,570,826 to be even in the realm of an equitable

6  damage award.  The court was persuaded, however, by Mr. Degen's trend analysis of

7  Gamber-Johnson's increased profit during the relevant time-period and finds that an

8  award of $492,332 would serve the policy considerations behind the Lanham Act.  The

9  court makes this determination even though there were other vendors mentioned in the

10 video and it is likely that an increase in profits during this time was attributable to sales

11 taken from other vendors and not just NPI.  The court nevertheless awards the total profit

12 to NPI in recognition of the jury's findings as to Gamber-Johnson's intent in

13 disseminating the false statements, as well as other equitable considerations.

14       F.   NPI's "Pool of Money" Theory

15       At the hearing on the issue of damages, the court asked NPI's counsel "what is the

16 best evidence in the record, from your point of view, that some of [Gamber-Johnson's]

17 profits during the 19-month period were attributable to the video?"  (Unof. 7/1/2010 Tr.

18 at 19.)  NPI's counsel responded with an explanation of what the court has termed its

19 "pool of money" theory.  Relying on cases such as *Lindy Pen* and *Playboy*, NPI stated its

20 position regarding its burden as:

21           and it comes right out of the statute, it comes right out of 1117(a), our
            burden is to identify the pool of sales that are attributable or related to the
22          infringement.  And there was no dispute in this case that the $54 million in

sales that were attributable to the devices that were at issue in this case was too big.  That $54 million was never disputed.  Those were the products that were shown in the video, those are the products that were sold, and no one ever disputed that.  So that, I believe, alone meets our burden.

(*Id.* at 19-20.)  NPI further explained that "damages can be actual damages, which we're not claiming, and they could be the defendant's profits.  And in order to be entitled to the defendant's profits, our burden is to show the pool of money that is affected by the video."  (*Id.* at 26.)  NPI makes similar arguments in its post-trial briefs.

The Ninth Circuit's opinions in *Lindy Pen* and *Playboy* do not support NPI's pool of money theory.  *See Lindy Pen*, 982 F.2d at 1408; *Playboy*, 692 F.2d at 1274-75.  In *Lindy Pen*, the court began its analysis of the award of unjust enrichment based on defendant's profits with the following statements: "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty.  Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity."  982 F.2d at 1408.  NPI extrapolates these statements to mean that once it shows Gamber-Johnson engaged in false advertisement in selling its vehicle mounts, all NPI has to do is point to the pool of money from those sales as evidence of unjust enrichment.  The burden then shifts to Gamber-Johnson to prove the portion of its sales that are attributable to factors other than the false advertisement.  NPI ignores the sentence before these statements—"an accounting is intended to award profits only on sales that are attributable to the infringing conduct"—as well as the court's reasoning in denying unjust enrichment damages.  *Id.*

1    The court's concern in *Lindy Pen*, and the reason it denied unjust enrichment

2    damages, is that the plaintiff, Lindy Pen, failed to segregate Bic's profits from sales

3    associated with the infringing activity from sales that did not involve infringement.  In

4    essence, Lindy did just as NPI does here.  Lindy pointed to the "pool of money" or profits

5    from all of Bic's sales without first attributing all of that profit to the infringing activity.

6    The Ninth Circuit determined that "Lindy failed to come forward with any evidence of

7    sales of the Bic 'Auditor's Fine Point' in the infringing market.  Lindy instead brought

8    forth proof of Bic's total sales."  *Id.*  The failure of Lindy to present "competent evidence

9    of its lost profits or Bic's unjust enrichment arising from the infringement" precluded it

10   from obtaining damages for Bic's trademark infringement.[4]  *Id.*

11   NPI also relies on the Ninth Circuit's decision in *Playboy* to support its pool of

12   money theory.  In *Playboy*, the defendant, a wholesale and retail jean business in South

13   Los Angeles, affixed onto its jeans approximately 20,000 labels bearing the combination

14   Playboy and rabbit head design marks owned by Playboy without a license from Playboy.

15   692 F.2d at 1273.  The district court awarded Playboy $12,750 in damages, which

16   represented the revenue Playboy would have received if the use of the mark had been

17   licensed.  *Id.* at 1274.  The Ninth Circuit held that these damages were not significant

18   enough to serve the policy considerations of the Lanham Act to make counterfeiting

19   unprofitable for the counterfeiter.  *Id.*  The Ninth Circuit then looked at the amount of

20

21   [4]  In *Lindy Pen*, the court was unwilling to award any damages to Lindy for Bic's
     trademark infringement because Bic's infringement was unintentional.  *Lindy Pen*, 982 F.2d at
22   1406.  Here, by contrast, the jury found that Gamber-Johnson deliberately engaged in false
     advertising.

1  profit that the defendant made from each pair of jeans it sold bearing the infringing mark

2  and found this amount to be the "appropriate computation" of damages.  *Id.*  In *Playboy*,

3  every pair of jeans sold by defendant bore the infringing mark.  One can presume that,

4  absent evidence to the contrary from the defendant, the profits made on the sale of the

5  jeans were attributable to the infringing mark.  Here, NPI has shown that only two

6  customers may have purchased Gamber-Johnson's vehicle mounts after watching the

7  video.  Yet, NPI did not offer evidence at trial that segregates Gamber-Johnson's profits

8  from sales to these two companies from all of its sales during the relevant time period.

9  The court cannot rest with the notion that all of Gamber-Johnson's sales of vehicle

10  mounts from the time it released the video until its retraction was attributable to the

11  video.  Unlike the *Playboy* case, where every purchaser would have seen the infringing

12  mark, the evidence here is that only some of Gamber-Johnson's customers would have

13  even seen the video.  The court therefore rejects NPI's pool of money theory in this case.

14  NPI had the initial burden of showing the amount of profits attributable to the video.  It

15  failed to do this at trial and cannot correct this error after the close of evidence.

16  **B.     Permanent Injunction**

17       NPI is entitled to an injunction in this case.  The breadth of the injunction is a

18  matter of dispute.  NPI moves the court for a injunction that: (1) prevents Gamber-

19  Johnson from distributing The Mounting Evidence in its current form; (2) prevents

20  Gamber-Johnson from disseminating other advertising or promotional materials

21  containing the statements the jury found to be false; and (3) requires Gamber-Johnson to

22  communicate, by certified mail, with each person or entity to whom it sent The Mounting

ORDER- 18

1   Evidence, informing each such person or entity that the challenged statements made in

2   the video are false.

3          The district court has the "power to grant injunctions, according to the principles

4   of equity and upon such terms as the court may deem reasonable . . . to prevent a

5   violation of subsection (a), (c), or (d) of Section 43" of the Lanham Act.  15 U.S.C. §

6   1116(a).  An injunction is warranted where the traditional four-factor test has been met.

7   *See e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (irreparable

8   injury; legal remedies are inadequate; the balance of hardships between the plaintiff and

9   defendant; and the public interest would not be disserved by a permanent injunction).  In

10  Lanham Act cases, the Ninth Circuit has held that this test is satisfied and injunctive

11  relief may be granted upon proof that a false statement of fact in a commercial

12  advertisement is material and has a tendency to deceive the relevant purchasing public.

13  *Southland Sod*, 108 F.3d at 1145 (entitlement to injunctive relief under the Lanham Act

14  does not require an independent showing of injury) (citing *Harper Hous*e, 889 F.2d at

15  210).

16         The jury found that Gamber-Johnson engaged in false advertisement in a

17  commercial advertisement, that it was material, and that it had a tendency to deceive the

18  relevant purchasing public.  Accordingly, NPI is entitled to an injunction.  Gamber-

19  Johnson argues that the injunction is unnecessary because it has already ceased

20  distribution of the video.  The court finds this position disingenuous considering that

21  Gamber-Johnson admitted that it never attempted to retract any of the copies it sent to

22  distributors and still encouraged its distributors to use the video.  Accordingly, it does not

1   appear that Gamber-Johnson has irrefutably demonstrated that it will not use the video.

2   *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) (quoting

3   2 J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 30:6, at 471 (2d ed.

4   1984)).  The question then is not whether to issue an injunction but how much activity to

5   enjoin.

6         The crux of the dispute is centered on NPI's request that the court order Gamber-

7   Johnson to send out a corrective letter by certified letter to every distributor or customer

8   that received a copy of the video.  While Gamber-Johnson contends that such an effort is

9   neither necessary nor warranted in this case, the court is concerned that Gamber-Johnson

10  continues to assert that the statements in the video were not false and thus it was not

11  going to publicize the jury's findings.  Accordingly, the court issues the injunction

12  proposed by NPI, with the following change.  The court declines to enjoin Gamber-

13  Johnson to send to each vendor or distributor that received the video, by certified mail, a

14  statement informing them that the challenged statements in the video are false.  Instead,

15  the court orders Gamber-Johnson to send by first class mail a copy of the jury's findings

16  in this case to each of the vendors or distributors that received the video.  (*See* Ex. A to

17  NPI's motion for permanent injunction and other relief (Dkt. # 205) (list of Gamber-

18  Johnson's marketing and sales contacts).)

19  **C.    Attorney's Fees**

20        Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases

21  may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  Here,

22  the jury's express finding that Gamber-Johnson's false advertising was deliberate

1    supports an award to NPI of its reasonable attorney's fees incurred in prosecuting the

2    action.  *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216-17 (9th Cir.

3    2003) (rejecting argument that "exceptionality requires egregious culpability" and

4    holding that exceptional case determination may be based solely on jury's finding that

5    "the defendant acted maliciously, fraudulently, deliberately, or willfully"); *see also BASF*

6    *Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1099 (7th Cir. 1994) (deliberateness

7    alone sufficient to support award of attorney fees).  A finding of an exceptional case

8    flows naturally from a finding that a defendant willfully violated the Lanham Act.

9    *Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000); *Earthquake*, 352 F.3d at 1217-19.

10   Because the jury found that Gamber-Johnson's false advertisement was done

11   deliberately, the court awards NPI its attorney's fees.  NPI shall submit to the court a

12   declaration setting forth its attorney's fees and supporting documentation by no later than

13   August 30, 2010.  Gamber-Johnson may file a response to the declaration submitted by

14   NPI, if any, by September 10, 2010.

15   **D.    Cost of the Action**

16           Under the express language of the Lanham Act, NPI is entitled to its costs.  If a

17   defendant has violated 15 U.S.C. § 1125(a), the plaintiff is entitled to recover "the costs

18   of the action."  *See Earthquake*, 352 F.3d at 1212.  The court directs NPI to file a bill of

19   costs fully specifying its recoverable costs and disbursements following entry of

20   judgment, in accordance with Local Rule W.D. Wash. CR 54(d)(1).

21

22

**E.      Prejudgment Interest**

The court does not award prejudgment interest.  Prejudgment interest is a "make whole" remedy.  That is it is appropriate in circumstances where the plaintiff will not be made whole without additional compensation in the form of prejudgment interest.  An award of prejudgment interest allows a prevailing party to be compensated "for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Schneider v. County of San Diego*, 285 F.3d 784, 789 (9th Cir. 2002) (internal quotation omitted).  NPI does not meet this standard and the court declines to award prejudgment interest.

## IV.      CONCLUSION

Based on the foregoing, the court GRANTS Gamber-Johnson's motion for judgment as a matter of law and adjusts the jury's award of damages to $492,332.  The court DENIES the remaining arguments raised in Gamber-Johnson's motion.  (Dkt. # 180.)  The court GRANTS Gamber-Johnson's motion to strike.  (Dkt. # 245.)  The court GRANTS NPI's motion for a permanent injunction, as amended by the court, GRANTS its motion for attorney's fees and costs, and DENIES its motion for prejudgment interest. (Dkt. # 205.)  The court directs the clerk to enter judgment consistent with the jury's verdict and this court's order.

1    Dated this 13th day of August, 2010.

2

3

4                                 JAMES L. ROBART

5                                 United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22